IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| GOFORIT ENTERTAINMENT, LLC, | § | |
| | § | |
| Plaintiff- | § | |
| counterdefendant, | § | |
| | § | Civil Action No. 3:08-CV-2011-D |
| VS. | § | |
| | § | |
| DIGIMEDIA.COM L.P., et al., | § | **SEALED OPINION** |
| | § | |
| Defendants- | § | |
| counterplaintiffs. | § | |

MEMORANDUM OPINION
AND ORDER

In this case alleging cyberpiracy, trademark infringement, and related claims, the principal issue presented is whether defendants-counterplaintiffs' use of Wildcard Domain Name System ("Wildcard DNS") technology subjects them to liability under statutory or common law. Concluding that it does not, the court grants summary judgment dismissing the claims of plaintiff-counterdefendant. The court denies the motion for partial summary judgment of plaintiff-counterdefendant addressed to certain of defendants-counterplaintiffs' counterclaims.

I

A

This is an action by plaintiff-counterdefendant GoForIt Entertainment, LLC ("GEL") against defendants-counterplaintiffs ("defendants") DigiMedia.com L.P. ("DigiMedia"), CyberFusion.com L.P. ("CyberFusion"), HappyDays, Inc. ("HappyDays"), Digimedia.com Management, Inc. ("Digimedia Management"), and Scott Day ("Day")

arising from defendants' alleged use of GEL's registered trademark GOFORIT.  GEL alleges claims for cyberpiracy under § 43(d) of the Lanham Act, 15 U.S.C. § 1125(d), which is part of the Anticybersquatting Consumer Protection Act ("ACPA"); service mark infringement under § 32(a) of the Lanham Act, 15 U.S.C. § 1114(1); use of false designations of origin, false descriptions, and false representations, in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); common law trademark infringement, in violation of Texas common law; and common law unfair competition, in violation of Texas common law.[1]

Defendants assert counterclaims for reverse domain name hijacking, under 15 U.S.C. § 1114(2)(D)(iv); tortious interference with contract, under Texas common law; and five claims seeking declaratory judgments that they are not liable on the basis of any of the five claims on which GEL seeks to recover from them.[2]

B

GEL's lawsuit arises from defendants' alleged use of GEL's federally registered mark GOFORIT in connection with their domain

---

[1]GEL also alleges a separate count for punitive damages.  This count is derivative of GEL's other claims, and it fails because defendants are entitled to summary judgment dismissing all of GEL's claims for which punitive damages could be recovered.

[2]DigiMedia, CyberFusion, and HappyDays also filed a third-party action against Tucows, Inc., but they voluntarily dismissed the third-party action with prejudice.

names.[3]   Essentially, GEL maintains that defendants redirected would-be visitors to GEL's "GoForIt.com" website to defendants' websites by intentionally using GEL's GOFORIT mark as a subdomain in connection with defendants' websites, for the sole purpose of causing consumer confusion and generating additional revenue (e.g., "pay-per-click" advertising fees) from the redirected traffic.[4]

GEL owns valid and enforceable service mark rights in the GOFORIT mark in connection with its services.  GEL also owns United States Trademark Registration No. 2,408,165 for the GOFORIT mark in

_____

[3]GEL's allegations focus on the conduct of DigiMedia, CyberFusion, and HappyDays.  It alleges that Digimedia Management is the sole general partner of DigiMedia and CyberFusion and that Day is the force behind the unlawful activities of DigiMedia, HappyDays, CyberFusion, and Digimedia Management and has *de facto* control over the registration of the domain names at issue.  For ease of reference, and unless the context otherwise requires, the court will refer to defendants collectively even though the conduct at issue involves DigiMedia, CyberFusion, and/or HappyDays.

[4]Both sides have moved for summary judgment.  As the court has stated in cases like *AMX Corp. v. Pilote Films*,

> [b]ecause both parties have filed motions for summary judgment, the court will principally recount only the evidence that is undisputed. If it is necessary to set out evidence that is contested, the court will do so favorably to the party who is the summary judgment nonmovant in the context of that evidence.  In this way it will comply with the standard that governs resolution of summary judgment motions.

*AMX Corp. v. Pilote Films*, 2007 WL 1695120, at *1 n.2 (N.D. Tex. June 5, 2007) (Fitzwater, J.) (citing *U.S. Bank Nat'l Ass'n v. Safeguard Ins. Co.*, 422 F.Supp.2d 698, 701 n.2 (N.D. Tex. 2006) (Fitzwater, J.)), *modified in part on other grounds*, 2007 WL 2254943 (N.D. Tex. Aug. 7, 2007) (Fitzwater, J.).

connection with computer information services, i.e., providing an index guide and directory database over the global computer information network in the nature of links to websites of others, and consulting services in the field of creating, maintaining, designing, and implementing websites for others.  GEL operates an Internet directory and website guide named "GoForIt.com."  The website is designed to enable Internet users to make quick and easy Internet searches and query multiple topic-specific websites from a single location.  GEL uses the GOFORIT mark in connection with its services.  The "GoForIt.com" website displays the GOFORIT mark above search categories listed on the website, including the categories "recipes," "business," "computers," and "games."

Internet website operators register domain names that identify the address where a specific website can be found.  Domain names consist of at least a top level domain and a second level domain.  Common top level domain names include ".com," ".org," ".gov," and ".net."  Second level domain names appear to the left of the top level domain, e.g., the designation "uscourts" in "uscourts.gov."  A domain name can also include a subdomain, i.e., a word that appears to the left of the second level domain name in a web address.  If "machine.widget.com" were a web address, "machine" would be the subdomain of the parent "widget.com" domain name.

GEL complains that defendant CyberFusion registered several domain names whose second level domain is identical to the top

level domains "com," "org," and "gov," including "org.com," "com.org," "gov.org," and "org.net" (the "TLD Domain Names"). GEL alleges on information and belief that the TLD Domain Names had been registered to defendant DigiMedia before being transferred to CyberFusion. Each TLD Domain Name takes the user to a directory-style website that CyberFusion operates and that contains categories for browsing or searching that are similar to the format of the GEL "GoForIt.com" website. The websites that use the TLD Domain Names contain hyperlinks that direct users of defendants' website to the websites of others.

GEL also alleges that DigiMedia registered hundreds of domain names, including "recipes.com," "business.org," and "computergames.com." (the "DigiMedia Domain Names"). The DigiMedia Domain Names lead to directory-style websites that contain categories related to the subject matter of the domain name and hyperlinks that direct visitors to websites of others. GEL makes similar assertions regarding defendant HappyDays and the domain names registered to it ("the HappyDays Domain Names").

GEL complains that many of the domain names included among TLD Domain Names, the DigiMedia Domain Names, and the HappyDays Domain Names (collectively, the "Accused Domain Names") use as the second level domain the same categories listed on the "GoForIt.com" website. GEL cites the example of "recipes.com." "Recipes" appears as one of the indexed categories on the "GoForIt.com"

website.   Defendants generate revenue when visitors to websites operated in connection with the Accused Domain Names "click through" to the websites of others.   Through "pay-per-click" advertising, defendants receive a commission from Yahoo! ("Yahoo") each time a visitor to one of their websites accesses the website of a business listed on defendants' websites.   Defendants have a greater potential for revenue from Yahoo when their websites experience more traffic.

GEL also alleges that it is now popular for Internet users to employ keyboard shortcuts with web browsers to aid in navigation while viewing an Internet page.   Shortcuts add "http://www." to the beginning and ".com" to the end of the text in the address bar. Another shortcut adds "http://www." to the beginning, and a user-specified top level domain suffix to the end of the text in the address bar.   For this shortcut, the default top level domain suffix is ".com."   So if this shortcut is used and the text "www.goforit.org" is in the address bar, the user would be directed to defendants' website "org.com" after reaching the address "http://www.www.goforit.org.com."   If a shortcut is used that adds "http://www." to the beginning and ".org" to the end of the text in the address bar, and if the text "goforit.com" is in the address bar, the user is directed to defendants' website "com.org" via the address "http://www.goforit.com.org."   Still another popular shortcut adds "http://www." to the beginning and ".net" to the end

of the text in the address bar.  If this shortcut is used and the text "goforit.org" is in the address bar, the user is directed to defendants' website "org.net" via "http://www.goforit.org.net."  If the text "www.goforit.org" is in the address bar, the user is directed to defendants' website "org.net" via "http://www.www.goforit.org.net."

GEL avers that defendants have used the GOFORIT mark in the Accused Domain Names by incorporating the mark as a subdomain name, e.g., "GOFORIT.COM.ORG."  When a visitor uses the GOFORIT mark as a subdomain in combination with defendants' domain names, Wildcard DNS directs the user to one of defendants' websites and the GOFORIT mark appears in the address bar directly above.  Otherwise, the website is identified as being defendants', and the GOFORIT mark remains in the address bar, even after the visitor clicks on one of the categories listed on the website.  According to GEL, CyberFusion has engaged in webpage framing and/or other website or server manipulation techniques.  It cites as an example that when a visitor is directed to CyberFusion's website using the GOFORIT mark as a subdomain, the GOFORIT mark remains in the address bar regardless which link on CyberFusion's website the visitor has selected.

Defendants acknowledge that they own domain names that generate revenue largely through pay-per-click advertising in which they permit third parties to provide advertisements on their

websites.   But they maintain that they have not used the GOFORIT mark in any of their domain names or websites and have never incorporated GOFORIT or any derivative into a domain name or used it on a website.  They posit that they merely use Wildcard DNS and that Wildcard DNS does not involve incorporating GOFORIT into a domain name or website.  Defendants rely on evidence that the owner of a second level domain name can set up subdomains, such as third level domains, under the second level domain.  These third level domains are not registered.   Instead of, or in addition to, creating specific subdomains under a second level domain, a second level domain can also operate in conjunction with Wildcard DNS. When Wildcard DNS is enabled, anything typed as a subdomain that is not predefined will lead the user to the website of the second level domain.  Defendants maintain that Wildcard DNS is a common, allowable process used by numerous reputable companies, and that the two largest domain-name registrars enable Wildcard DNS by default when someone registers through them.

Defendants also point out that GOFORIT has been specifically excluded from the Wildcard DNS on defendants' sites since 2006, after GEL sued defendants in Florida based on essentially the same claims asserted in this case.  Defendants maintain that GEL's suit was the first time they had ever heard of GEL, but they excluded "goforit" from the Wildcard DNS capability in order to accommodate GEL, notwithstanding their view that GEL's legal claim was

baseless.

According to defendants, in using Wildcard DNS, they have done nothing to set up "goforit" or any other particular name or word as a subdomain on a website, and using Wildcard DNS does not constitute cybersquatting or trademark infringement. They allege that Wildcard DNS is widely used, and that, if it is found to be cybersquatting or trademark infringement, many people and entities will be subject to potential liability.

C

DigiMedia, HappyDays, and CyberFusion ("counterplaintiffs") allege counterclaims against GEL. They maintain that Tucows, Inc. ("Tucows"), the registrar for their domain names, locked their domain names ("the Locked Domain Names") in response to a request from GEL that Tucows implement a registration lock. According to counterplaintiffs, the registration lock prevents them from changing any of the Locked Domain Names, selling them, or moving the websites to another computer or hosting company.

Counterplaintiffs allege that, at the time of the letter, they were negotiating the sale of one of the Locked Domain Names. As a result of the letter, the prospective buyer suspended negotiations. Counterplaintiffs were also negotiating the sale of other Locked Domain Names but were unable to pursue this opportunity because the sale required that the names be transferred to a different entity. Counterplaintiffs were also in the process of changing the company

that hosts their websites.  They had already paid the new hosting company and were obligated to do so for the remainder of the term of their agreement.  But before counterplaintiffs could modify the domain name records to point to the new hosting company, the registration lock was implemented, and counterplaintiffs were unable to move their websites to the new hosting company, resulting in additional expenses.  Counterplaintiffs were also reconfiguring the nameservers for two Locked Domain Names in order to increase their pay-per-click revenue.  The planned reconfiguration required that the registration records for domain names be modified.  The registration lock prevented the planned reconfiguration from being completed, and counterplaintiffs' pay-per-click revenue from the two domain names was approximately one-half of what it would have been had the planned reconfiguration been completed.

Counterplaintiffs also allege that, at the time of the letter, they were partnering with third parties to use certain Locked Domain Names for various revenue-generating Internet ventures. Counterplaintiffs had the right to terminate the arrangement immediately or within a reasonable notice period.  To fully terminate the partnerships, counterplaintiffs would need to make changes to the registration records for the domain names involved. Because the registration lock prevents such changes, counterplaintiffs were unable to fully terminate the partnerships and were locked into the agreements.

GEL maintains that defendants cannot establish each of the essential elements of their counterclaims for reverse domain name hijacking and tortious interference with contract.

D

Defendants move for summary judgment dismissing GEL's claims. The court heard oral argument on this motion.   GEL moves for partial summary judgment on defendants' counterclaims for reverse domain name hijacking and tortious interference with contract.[5]

II

Except as addressed below, because defendants and GEL are moving for summary judgment on claims or counterclaims as to which the opposing party or parties will bear the burden of proof at trial, they can meet their summary judgment obligation by pointing the court to the absence of evidence to support the opposing party's claims.   *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).   Once they do so, the opposing party must go beyond its pleadings and designate specific facts showing there is a genuine issue for trial.   *See id.* at 324; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam).   An issue

---

[5]As noted, defendants also assert counterclaims seeking declaratory judgment that they are not liable for the claims that GEL asserts.   Although GEL styles its motion as one seeking summary judgment, it does not address these claims.   The court therefore treats GEL's motion as a motion for *partial* summary judgment.   *See* N.D. Tex. Civ. R. 56.3(c) ("If a moving party seeks summary judgment on fewer than all claims or defenses, the motion must be styled as a motion for partial summary judgment.").

is genuine if the evidence is such that a reasonable jury could return a verdict in the opposing party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The opposing party's failure to produce proof as to any essential element of a claim renders all other facts immaterial. *See Trugreen Landcare, L.L.C. v. Scott*, 512 F.Supp.2d 613, 623 (N.D. Tex. 2007) (Fitzwater, J.). Summary judgment is mandatory if the opposing party fails to meet this burden. *Little*, 37 F.3d at 1076.

In one respect GEL is seeking summary judgment based on an affirmative defense to one of defendants' Texas-law counterclaims. To be entitled to summary judgment on a defense for which it will have the burden of proof at trial, GEL "must establish 'beyond peradventure all of the essential elements of the . . . defense.'" *Bank One, Tex., N.A. v. Prudential Ins. Co. of Am.*, 878 F. Supp. 943, 962 (N.D. Tex. 1995) (Fitzwater, J.) (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)). This means that GEL must demonstrate that there are no genuine and material fact disputes and that it is entitled to summary judgment as a matter of law. *See Martin v. Alamo Cmty. Coll. Dist.*, 353 F.3d 409, 412 (5th Cir. 2003). "The court has noted that the 'beyond peradventure' standard is 'heavy.'" *Carolina Cas. Ins. Co. v. Sowell*, 603 F.Supp.2d 914, 923 (N.D. Tex. 2009) (Fitzwater, C.J.) (quoting *Cont'l Cas. Co. v. St. Paul Fire & Marine Ins. Co.*, 2007 WL 2403656, at *10 (N.D. Tex. Aug. 23, 2007) (Fitzwater, J.)).

- 12 -

III

The court turns first to defendants' motion for summary judgment addressed to GEL's claims.  GEL's first cause of action is asserted under § 43(d) of the Lanham Act, 15 U.S.C. § 1125(d), a part of the ACPA.

A

Defendants move for summary judgment dismissing this claim. They contend that GEL cannot recover under the ACPA because there is no evidence that defendants have registered, trafficked in, or used any domain name that is in any way similar to GEL's GOFORIT mark, and because there is no evidence that they acted with any bad-faith intent to profit from GEL's mark.

Defendants maintain that their use of third level domains falls outside the scope of what the ACPA protects because, to be a "domain name" for Lanham Act purposes, 15 U.S.C. § 1127 requires that the domain be "registered with or assigned by" a domain name registrar.  They reason that because only top level and second level domains are registered, and because GEL's entire case is founded on defendants' alleged use of third level domains, subdomains, or Wildcard DNS as it relates to subdomains, none of GEL's allegations involves a "domain name" within the meaning of the ACPA.

Defendants also posit that, even if they are somehow found to have used a "domain name" similar to GEL's mark, they have not done

- 13 -

so with bad-faith intent.  The ACPA provides that bad faith intent cannot be found in any case in which the court determines that the person who allegedly registered, trafficked in, or used a domain name believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful.  *See* 15 U.S.C. § 1125(d)(1)(B)(ii).  Defendants assert that their actions were not in bad faith because Wildcard DNS (defendants' allegedly infringing action) is widely used by highly reputable companies and GEL's own expert admits it is allowed.  Defendants maintain that because GEL cannot establish two of the four essential elements of this cause of action, the claim must be dismissed.[6]

GEL responds that the ACPA should be read broadly to extend liability to subdomain use.  It posits that defendants are using their registered domain names in combination with infringing subdomains, such that they are "using" a "domain name" within the meaning of the ACPA.  GEL also argues that the legislative history of the ACPA calls for a broad reading because it is replete with examples of how the ACPA is meant to protect trademark owners. Finally, to support the argument that the ACPA should extend to unregistered domains, GEL notes that the ACPA imposes liability on those who "traffic[] in or use[]" domain names, not just registrants.

---

[6]Defendants also maintain that GEL's claim for enhanced damages fails as a matter of law.  Given the court's disposition of defendants' other arguments, it need not reach this contention.

- 14 -

B

The court holds that defendants are entitled to summary judgment dismissing GEL's cyberpiracy claim under § 43(d) of the Lanham Act, 15 U.S.C. § 1125(d), because, as a matter of law, third level domain names are not covered by the ACPA.  Under 15 U.S.C. § 1125(d)(1)(A),[7] a party can be held liable if it registers, traffics in, or uses a "domain name" that is "identical or confusingly similar" to a distinctive mark, 15 U.S.C.

---

[7]15 U.S.C. § 1125(d)(1)(A) provides:

> A person shall be liable in a civil action by the owner of a mark . . . if, without regard to the goods or services of the parties, that person——
>
> > (i) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and
> >
> > (ii) registers, traffics in, or uses a domain name that——
> >
> > > (I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;
> > >
> > > (II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark; or
> > >
> > > (III) is a trademark, word, or name protected by reason of section 706 of Title 18 or section 220506 of Title 36.

§ 1125(d)(1)(A)(ii)(I), with bad faith intent to profit from the mark, *id.* § 1125(d)(1)(A)(i).[8]  Under the statute, "[t]he term 'domain name' means any alphanumeric designation which is registered with or assigned by any domain name registrar, domain name registry, or other domain name registration authority as part of an electronic address on the Internet."  15 U.S.C. § 1127. Defendants maintain that a third level domain—the level in question in this case—is outside the scope of the statute, because it is not "registered with or assigned by" a domain name registrar. The court agrees.  The only part of a web address that must be registered is the second level domain.  Establishing a third level domain does not require registration with or assignment by a domain name registration authority.

> Presently, users may not claim their own top level domains, but anyone wishing to obtain a second level domain name may, for a fee, enter into a registration agreement with a domain name registrar, thereby acquiring exclusive rights to that second level domain and *the ability to create as many third (or higher) level domains as desired under that second level domain.*

*Sallen v. Corinthians Licenciamentos LTDA*, 273 F.3d 14, 19 (1st Cir. 2001) (emphasis added).

Although GEL challenges the assertion that third level domain names are not "registered with or assigned by" a domain name

---

[8]15 U.S.C. § 1125(d)(1)(A)(ii)(II) and (III) do not apply here because GEL does not allege that GOFORIT is a famous mark or a trademark, word, or name protected by statute.

registrar, it cites only two pieces of evidence in support: a paragraph from the declaration of one of its principals, and a heavily excerpted quotation from a Senate report.  The paragraph from the declaration on which GEL relies does not alter the court's legal conclusion that domain name registrars do not assign third level domains.  The cited portion states: "Domain name registrars (e.g., Network Solutions, Tucows and Godaddy) can assign second level domains.  Once a corporation or individual registers any second level domain, they (and they alone) are free to create an unlimited number of specific subdomains that resolve to their servers and websites."  P. Mar. 1, 2010 App. 97.  This statement actually supports the conclusion that domain name registrars assign second level domain names but not subdomains (e.g., third level domains) under the second level.  Accordingly, because under the ACPA a "domain name" is "registered with or assigned by" a website registrar, and third level domains are not registered or assigned, third level domains fall outside the ACPA definition of a "domain name."

C

Nor does defendants' use of Wildcard DNS require registration with or assignment by a domain name registration authority.  By definition, Wildcard DNS, encompasses an infinite combination of alphanumeric characters *other than* those specifically assigned or excluded.

Although the question of ACPA liability through the use of Wildcard DNS has not previously been addressed,[9] courts have interpreted the term "domain name" consistently with the court's application here (i.e., referring only to the second and top level domains that must be registered or assigned). "Domain names consist of a second-level domain——simply a term or series of terms (*e.g.*, a2zsolutions)——followed by a top-level domain, many of which describe the nature of the enterprise." *Interactive Prods. Corp. v. a2z Mobile Office Solutions, Inc.*, 326 F.3d 687, 691 (6th Cir. 2003). "One acquires a domain name (top level and second level) by purchasing it from, and registering it with, a registrar designated for the relevant top level domain, or, alternatively, by purchasing it from someone who already owns the name and offers it for sale." *Ctr. for Democracy & Tech. v. Pappert*, 337 F.Supp.2d 606, 615 (E.D. Pa. 2004). "The owner of a domain may create sub-domains that are identified to the left of the second level domain and separated from it by a dot, e.g., subdomain.attorneygeneral.gov." *Id.*

---

[9]It does not appear that any federal court has as yet analyzed in depth the trademark implications of websites that employ Wildcard DNS. As discussed *infra*, one court rejected an "unclean hands" argument based on alleged use of the Wildcard function, but it did not extensively analyze the issue. *See Verizon Cal. Inc. v. Navigation Catalyst Sys., Inc.*, 568 F.Supp.2d 1088, 1098 (C.D. Cal. 2008).

> When an individual or an organization desires to register a domain name, it may do so through any accredited registrar . . . . The applicant first chooses one of the TLDs offered by the registrar and then creates an accompanying [second level domain] name, thereby fashioning a potential domain name, which is then submitted electronically to the registrar for approval.

*Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 415-416 (2d Cir. 2004) (quoting *Smith v. Network Solutions, Inc.*, 135 F.Supp.2d 159, 1161-62 (N.D. Ala. 2001)). "A registrant can register a domain name only through companies that serve as registrars for second level domain names." *Coal. for ICANN Transparency Inc. v. Verisign, Inc.*, 464 F.Supp.2d 948, 952 (N.D. Cal. 2006). The court has found no case, and GEL has cited none, that holds that a portion of a web address other than a second or top level domain constitutes a "domain name" within the meaning of the ACPA.

### D

In sum, the ACPA precludes the use of "a domain name that . . . is identical or confusingly similar to [a mark]." 15 U.S.C. § 1125(d)(1)(A)(ii)(I). A "domain name" is "any alphanumeric designation which is registered with or assigned by any domain name registrar." 15 U.S.C. § 1127. Because third level domains—whether specifically designated or using Wildcard DNS—are not "registered with or assigned by any domain name registrar," a straightforward reading of the text shows that GEL cannot recover under the ACPA for defendants' use of Wildcard DNS in a third level

domain.  Moreover, courts have never applied the ACPA to third level domains.  In the instant case, the only "domain names" at issue within the meaning of the ACPA are the second and top level domain combinations owned by defendants, such as "recipes.com" or "com.org," which do not themselves contain any reference to GEL's mark.  GEL's argument that these second and top level domain combinations, when used in conjunction with Wildcard DNS, constitute "use of domain name," in violation of the ACPA, lack force.  This is because, for ACPA purposes, the domain name itself, rather than the use of the domain name in conjunction with Wildcard DNS, must be identical or confusingly similar to GEL's mark.  GEL cannot establish that defendants' second and top level domain combinations are themselves in any way similar to the GOFORIT mark.  Defendants are therefore entitled to summary judgment dismissing this claim.

IV

GEL also asserts a claim for service mark infringement under § 32(a) of the Lanham Act, 15 U.S.C. § 1114(1).

A

Defendants argue that GEL cannot recover under § 1114(1) because, assuming that GEL has a legally protectable mark, defendants have not used a reproduction, counterfeit, copy, or colorable imitation of GEL's mark.

GEL argues in response that defendants' actions constitute

"use" of its mark because their conduct hinders or impedes the user from accessing GoForIt.com by directing users to defendants' sites, while still displaying the GOFORIT mark on the address bar.  GEL notes that, for the GOFORIT mark to be displayed in the address bar, it was necessary for defendants to take affirmative steps to configure their sites this way, beyond merely enabling Wildcard DNS.

B

Section 1114(1) imposes liability on any entity that "use[s] in commerce any . . . colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion."  When determining what constitutes "use," the court examines 15 U.S.C. § 1127, which defines the key terms in the statute and provides, in pertinent part:[10]

_____

[10]Courts interpreting § 1127 are divided over whether to apply this "use in commerce" definition, often used in the trademark _registration_ context, to the trademark _infringement_ context.  _See, e.g., Rescuecom Corp. v. Google, Inc._, 562 F.3d 123, 133, 139-40 (2d Cir. 2009) (noting that statute's requirement of a "bona fide use" would make "no sense whatsoever" in the infringement context because this would allow bad faith infringers to escape liability); _Sensient Techs. Corp. v. SensoryEffects Flavor Co._, 613 F.3d 754, 761-62 (8th Cir. 2010) (noting split in authority about whether statutory definition applies to infringement actions).  The Fifth Circuit, however, has applied § 1127's "use in commerce" definition to infringement actions without much discussion, essentially disregarding the "bona fide use" element.  _See, e.g., Elvis Presley Enters. v. Capece_, 141 F.3d 188, 197 (5th Cir. 1998).  This court will follow the Fifth Circuit in applying § 1127's definition to

- 21 -

> In the construction of this chapter, unless the contrary is plainly apparent from the context——
>
> *     *     *
>
> The term "use in commerce" means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark. For purposes of this chapter, a mark shall be deemed to be in use in commerce——
>
> *     *     *
>
> (2) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services.

Under this definition, § 1127 requires that GEL prove "use in commerce" by demonstrating that a mark or a colorable imitation of a mark has been "used or displayed in the sale or advertising of services and the services [have been] rendered in commerce."   15

---

this infringement claim and in limiting its analysis to the second sentence.  Moreover, the Fifth Circuit's approach is logical.  It is plainly apparent from the context that a defendant cannot escape infringement liability simply by acting in bad faith (so as to circumvent the statutory definition, which refers to "bona fide use").   In fact, bad faith, far from exculpating infringing conduct, is actually a ground for treble damages.  *See* 15 U.S.C. § 1117(b)(1).  To avoid absurd results, *see Waggoner v. Gonzales*, 488 F.3d 632, 638 (5th Cir. 2007), and to preserve structural consistency with other provisions in the Lanham Act, *see Smith v. Doe*, 538 U.S. 84, 92 (2002) ("We consider the statute's text and its structure to determine the legislative objective."), the court concludes that the "bona fide use" component of § 1127's definition does not apply to infringement claims.

U.S.C. § 1127.

C

GEL alleges two predicates for how defendants have "used or displayed" the GOFORIT mark: (1) defendants "used" the mark by registering a TLD website such as "com.org" and enabling Wildcard DNS, intending that third parties would enter addresses containing others' trademarks, such as "goforit.com.org"; and (2) defendants "displayed" the GOFORIT mark in the sale and advertising of their services by programming the address bar to display "goforit.com.org" after the Wildcard DNS directed the user to the "com.org" website.

1

GEL cannot recover on the first ground. A reasonable jury could only find that defendants have permitted web users to enter any combination of alphanumeric characters to form a third level domain of "com.org." One possible combination (out of a virtually infinite number) is "goforit.com.org," but this is simply because "goforit" is a combination of letters. A reasonable jury could not find from the summary judgment evidence that defendants were even aware of GEL's existence when they enabled Wildcard DNS on their websites, nor could the jury reasonably find that defendants "used" GEL's mark when they enabled Wildcard DNS.

Moreover, a reasonable jury could not find that at any subsequent point defendants began using GEL's mark. Any use of the

GOFORIT mark was by unrelated third-party users who entered the characters "goforit" into their web browser and arrived at one of defendants' websites through the Wildcard DNS function.   The summary judgment evidence of defendants' "use" only shows that some web users included "goforit" when typing a web address that led to defendants' websites.   Based on GEL's evidence——essentially, that "goforit" is an arrangement of letters that can be used to activate defendants' Wildcard DNS function, and that some web users have apparently done so——would not enable a reasonable jury to find that defendants have "used" GEL's trademark, within the meaning of the Lanham Act.[11]

Even if defendants could have foreseen that some third-party web users might type in a trademarked name to trigger the Wildcard DNS, the fact that the TLD websites' Wildcard function processes a trademarked input does not constitute a "use" in "sale or advertising" of services.   *See 1-800 Contacts, Inc. v. WhenU.com, Inc.*, 414 F.3d 400, 408-09 (2d Cir. 2005) (holding that defendant's software, which stored plaintiff's trademark in a non-public

---

[11]Some Internet trademark cases with similar factual patterns involve claims under the Lanham Act for *contributory* trademark infringement.  *See, e.g., Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 103-10 (2d Cir. 2010); *Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980, 983 (9th Cir. 1999).   Because GEL has not alleged contributory infringement, the court need not analyze the merits of such a claim.  *See Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1246 (11th Cir. 2007) ("We decline [plaintiff's] invitation to construe its case as one for contributory trademark infringement, where the elements in support of such a claim have not been pled.").

directory and triggered pop-up advertisements belonging to the same category of services, did not constitute "use" of a trademark in sale or advertising); *U-Haul Int'l, Inc. v. WhenU.com, Inc.*, 279 F.Supp.2d 723, 729 (E.D. Va. 2003) (declining to find "use" for Lanham Act purposes where defendant did not advertise or promote plaintiff's trademarks); *Wells Fargo & Co. v. WhenU.com, Inc.*, 293 F.Supp.2d 734, 757 (E.D. Mich. 2003) ("There can be no liability under the Lanham Act absent the use of a trademark *in a way that identifies the products and services being advertised by the defendant*.") (emphasis added).

In the *WhenU.com* cases, as in the instant case, the defendant anticipated that web users might enter trademarked words and web addresses into their browser, to the extent that they even put trademark-resembling keywords (i.e., the keyword "www.1800contacts.com" when the trademark in question was "1-800CONTACTS") into an internal directory in order to connect users to contextually relevant pop-up advertising. *1-800 Contacts*, 414 F.3d at 408-09 (finding compelling a district court's analysis characterizing WhenU.com's use of trademark as "'pure machine-linking function' that was not 'use' under the Lanham Act"). Yet even such deliberate use of a trademark-resembling keyword did not constitute a "use" for Lanham Act purposes because the internal workings of the directory's keyword use were not visible to consumers (and therefore not likely to cause source confusion).

*See id.* ("A company's internal utilization of a trademark in a way that does not communicate it to the public is analogous to a[n] individual's private thoughts about a trademark."). WhenU's program may have been designed to divert users' attention to competitors' pop-up ads, but it did not prevent users from visiting the plaintiff's websites and it did not pass off competitors' products as the plaintiff's. In the instant case, as GEL points out, defendants display their content on the browser itself rather than pulling up a pop-up in a separate window. Despite that one difference, this court still finds defendant's actions analogous to WhenU's actions in the relevant way: the Wildcard function in the instant case does not handle the third-party user's trademark input *as a trademark*, but merely as a web address that internally redirects to the domain name's homepage. *See Wells Fargo*, 293 F.Supp.2d at 762 (finding no Lanham Act "use" of trademark when defendant did not use trademark to indicate anything about the source of the products and services it advertises"); *1-800 Contacts*, 414 F.3d at 408-09 (finding use of web address containing trademark not to be infringing use because the addition of "www." and "com." to a trademarked word transformed it into web address that functioned as a "public key"). Wildcard DNS, as an internal function of websites such as "com.org," may increase traffic to the "com.org" website and increase sales, but "com.org" does not use the trademarked user inputs *in a source-identifying way* to pass off

- 26 -

their services as GEL's.  *Cf. Holiday Inns, Inc. v. 800 Reservation, Inc.*, 86 F.3d 619, 625-26 (6th Cir. 1996) (holding that plaintiff's trademark rights over "1-800-HOLIDAY" did not give it control over defendant's confusingly similar "1-800-H[zero]LIDAY," even if its customers sometimes misdialed to defendant's number, because defendant never promoted the number in connection with plaintiff's trademark).  The TLD websites do not display anyone else's logos, marks, or distinctive trade dress. Defendants have never tried to leverage others' trademarks into profit by selling specific trademarked keywords to advertisers. *Cf. Rescuecom*, 562 F.3d at 129-30 (distinguishing Google's advertisements from WhenU's advertisements by noting that Google sold specific trademarked keywords to advertisers looking for sponsored ad space, while WhenU took users' inputs, trademarked or not, to match them with relevant advertisers, without offering any particular trademarks for sale).  Moreover, as with the ACPA claim, there is apparently no precedent to support GEL's argument that a third level domain name can infringe on trademark rights, much less its assertion that activation of the Wildcard function in a third level domain can do so.  The court therefore concludes as a matter of law that defendants have not "used" GEL's trademarks for the purposes of § 1114(1).

2

Nor can GEL recover on the second ground.  GEL maintains that defendants have infringed its mark by directing the browser to display "goforit.com.org" in the address bar, as though to pass off "com.org" as "GoForIt.com," a "colorable imitation" of GEL's GOFORIT mark.  But mere display of a domain name to indicate an address is not enough to constitute "use" in sale or advertising of services.  *See Bird v. Parsons*, 289 F.3d 865, 878 (6th Cir. 2002) (citing *Lockheed Martin Corp. v. Network Solutions, Inc.*, 985 F. Supp. 949, 956 (C.D. Cal. 1997) (agreeing with analysis in case where "[defendant] merely uses domain names to designate host computers on the Internet," and concluding that "[t]his is the type of purely nominative function that is not prohibited by trademark law").  A reasonable jury could only find that, in any instance when "goforit.com.org" appears in the address bar, this is because the user has somehow entered "goforit.com.org" into the address bar at some point, whether intentionally or by inadvertent misuse of shortcut keys, to trigger Wildcard DNS in the first place.  It would be different if defendants had configured their website to display "GoForIt.com" on the user's address bar after redirecting users to the "com.org" site and displayed other indications of affiliation with GEL and its GOFORIT mark.  But a reasonable jury could not find that there is anything deceptive in itself about calling a website what it actually is: when a user enters

"goforit.com.org" into the address bar, the user may be redirected to "com.org," but that does not change the fact that the content the user is seeing is the actual content assigned to the "goforit.com.org" address. Aside from the address bar display (and even this is a verbatim display of what the third-party user, and not defendants, inputted), there is nothing in defendants' websites that resembles GEL's mark. And simply using a web address for its function as a web address is not trademark infringement. *See, e.g.*, *Bird*, 289 F.3d at 878; *Wells Fargo*, 293 F.Supp.2d at 762.

Accordingly, defendants are entitled to summary judgment dismissing GEL's service mark infringement claim under the Lanham Act, 15 U.S.C. § 1114(1).

V

GEL also asserts a claim of use of false designations of origin, false descriptions, and false representations, in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). GEL asserts that defendants violated § 1125(a) by allowing "goforit" to be used as a third level domain to "com.org," especially because "goforit" remained visible in the browser's address bar as long as a user remained on the site.

A

Defendants contend they are entitled to summary judgment because GEL has presented no evidence that a defendant made a false statement about their services or damaged GEL. GEL responds that

- 29 -

defendants have made a false or misleading statement of fact by allowing web addresses containing "goforit" to remain on the address bar after a user is directed to defendants' websites. GEL alleges that such displays inevitably result in user confusion as to whether the website displayed is affiliated with the GOFORIT brand.

B

To prevail under § 1125(a)(1),[12] GEL need not present evidence of a "false statement." Section 1125(a)(1) is broader in scope

---

[12]15 U.S.C. § 1125(a)(1):

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
>> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>>
>> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

- 30 -

than § 1114(1), such that a plaintiff can prevail by showing use in commerce of "*any word, term, name, symbol, or device, or any combination* thereof" that "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." *Id.* (emphasis added). Thus although "goforit.com.org" is not a "domain name" for purposes of the ACPA, and a web address is not a "colorable imitation," in violation of § 1114(1), defendants can still be liable under § 1125(a)(1) for using a combination of Wildcard DNS and TLD-imitating domain names——a combination of "device," "name," and "symbol"——that causes trademark confusion.

Even so, GEL's § 1125(a)(1) claim fails because defendants have pointed to the absence of evidence that GEL was damaged by defendants' conduct and to the absence of evidence that any of defendants' alleged deceptions was likely to influence purchasing decisions. GEL has failed to produce summary judgment evidence in response that would enable a reasonable jury to find likelihood of confusion as to affiliation, connection, association, origin, approval, or sponsorship, or to find that GEL was damaged.

To meet the "likelihood of confusion" element of § 1125(a)(1)(A), there must be "a probability of confusion" rather than a mere possibility. *See Xtreme Lashes, LLC v. Xtended Beauty,*

*Inc.*, 576 F.3d 221, 226 (5th Cir. 2009).  The following nonexhaustive list of factors is used to determine the likelihood of confusion: (1) the strength of the plaintiff's trademark, (2) mark similarity, (3) product similarity, (4) outlet and purchaser identity, (5) advertising media similarity, (6) defendant's intent, (7) actual confusion, and (8) care exercised by potential purchasers.  *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 329 (5th Cir. 2008).  No one factor is dispositive, and a finding of likelihood of confusion does not even require a positive finding on a majority of these "digits of confusion."  *Elvis Presley Enters.*, 141 F.3d at 194.

On the first factor, a reasonable jury could only find that the strength of GEL's GOFORIT mark is weak, being derived from the generic English expression of encouragement: "Go for it!"  The summary judgment record reflects that there are several other websites that use some variation of "goforit" or "go4it," which appear to have no relation to GEL's mark.  Thus GEL's GOFORIT mark is weak enough that a reasonable jury could not find that any user who typed "goforit" into an address bar necessarily intended to use GEL's GOFORIT mark as opposed to some other use of "goforit."  In fact, some of the user entries contained in the summary judgment record appear to refer unequivocally to entirely unaffiliated websites (e.g., "www.chinagoforit.com" and "goforit.heinle.com").  Without any evidence of the GOFORIT mark's consumer recognition

power, there is no proof that would enable a reasonable jury to find that any of the redirected users was even aware of GEL's GOFORIT mark.  And it follows that, without consumer recognition, there can be no consumer confusion.

The second factor——mark similarity between GEL's GOFORIT mark and defendants' website content——is also weak.  As noted above, there are no trademarks on TLD Domain Names websites such as "com.org," and there is no similarity between the TLD Domain Names such as "com.org" and the GOFORIT mark.  GEL may argue that the proper point of comparison is not between "com.org" and GOFORIT, but between "goforit.com.org" and GOFORIT, because the danger of consumer confusion occurs when users' web browsers display "goforit.com.org" in the address bar even though the browser window actually reflects the content of the "com.org" website rather than the "GoForIt.com" website.  But even using that point of comparison, the similarity between "GoForIt.com" and the "goforit.com.org" displayed in a browser's address bar cannot alone be confusing in the trademark sense because "goforit.com.org" is merely the display of a website address.[13]  A reasonable jury could not find that a user would construe an address bar display, especially one that merely retains what was just inputted by the user, as a "mark" when nothing else in the page content indicates

---

[13]*See Bird*, 289 F.3d at 878; *Wells Fargo*, 293 F.Supp.2d at 762 (noting that purely nominative function of designating a certain web location is not trademark infringement).

GOFORIT sponsorship or affiliation.

In analyzing product similarity, outlet and purchaser identity, and advertising media similarity,[14] the court notes some superficial similarities in the layout of GoForIt.com and TLD Domain Name sites such as "com.org," to the extent that both provide similar services to a similar pool of potential customers via the Internet: the service of connecting Internet users to directories of links and search tools.  In that sense, GEL and defendants share product similarity, a similar target customer base, and similar means of obtaining customers.  A reasonable jury could only find, however, that the similarity of product design is attributable to the fact that defendants' TLD Domain Name websites and GEL's GoForIt.com website are both web directories; the functional design choices are common to many web directory websites rather than distinctive to GEL, and GEL has not produced any evidence that defendants have copied any product feature that uniquely identifies GEL's services.  *See Am. Rice, Inc.*, 518 F.3d at 331-32 (distinguishing between case where a common feature was "universally associated in the public mind" with a product for reasons independent of marketing, and a case where the "universal association" was created by promotion of the product's mark).  The court thus concludes that a reasonable jury could not find a

---

[14]The court omits discussion of the eighth factor because the parties have not provided any evidence of the level of care exercised by potential customers (i.e., visitors to the websites).

probability of confusion under the third, fourth, fifth, and eighth factors by themselves.   As a matter of law, there can be no likelihood of confusion as to affiliation, connection, association, origin, approval, or sponsorship where there is no evidence that the visitors directed to defendants' websites were even aware of GEL's mark or the distinctiveness of GEL's website layout.

The sixth and seventh factors—defendants' intent and actual confusion—are also insufficient to support GEL's claim.   GEL has failed to present evidence that would permit a reasonable jury to find that defendants intended to target GEL's mark.   And the only evidence of confusion that GEL cites in its briefing consists of (1) screenshots of defendants' websites displaying "goforit.com.org" or other Wildcard DNS results incorporating "goforit" in the address bar; (2) Russell Tewksbury's declaration describing the technical steps of Wildcard DNS; (3) log files indicating that some users entered some combinations of letters that included "goforit" in the web address; and (4) Eric Grant's ("Grant's") testimony admitting that some users were confused as to how they arrived at websites such as "com.org."   The first three items of evidence merely show similarity, not confusion.   There must be some evidence of secondary meaning recognition on a potential customer's part before there can be trademark confusion. The fourth item of evidence shows confusion, but not of the type that § 1125(a)(1) is meant to address.   According to Grant's

testimony, users on message boards expressed confusion as to how they *arrived at* websites such as "com.org," but there is no summary judgment evidence that users mistook "com.org" to be affiliated with or approved by the websites they intended to reach.  On the contrary, the fact that some users, after experiencing Wildcard DNS, suspected that they had been infected with spyware suggests that it was immediately apparent to users that defendants' websites, which lacked trademark and trade dress similarity with their target sites, were of a different origin.  Moreover, there is no evidence that any of defendants' TLD website visitors had specifically confused the website with GEL's website.  A reasonable jury could not therefore find consumer confusion of the type necessary to prevail under § 1125(a)(1)(A).  *See Batiste v. Island Records, Inc.*, 179 F.3d 217, 225 (5th Cir. 1999) (affirming summary judgment in favor of defendants where plaintiffs offered "no evidence of a genuine issue of consumer confusion"); *Matrix Essentials, Inc. v. Emporium Drug Mart, Inc.*, 988 F.2d 587, 591 (5th Cir. 1993) (refusing to entertain plaintiff's allegation that uninformed consumers could mistake the source of defendant's products, because there was no evidence to support such allegations).

C

Nor can GEL prevail under § 1125(a)(1)(B).  Assuming *arguendo* that the mere display of an address bar constitutes "commercial

- 36 -

advertising or promotion" under § 1125(a)(1)(B), GEL must prove five elements to establish this claim.[15]  If a statement is literally false, then the court must assume that it actually misled consumers, without requiring any evidence of deception from the plaintiff.  *IQ Prods. Co. v. Pennzoil Prods. Co.*, 305 F.3d 368, 375 (5th Cir. 2002) (citing *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 497 (5th Cir. 2000)).  When a statement is merely misleading or ambiguous, however, the plaintiff must demonstrate actual deception through direct evidence of consumer reaction or consumer surveys.  *Id.*

GEL alleges that defendants made a false or misleading representation of the nature of its services in allowing "goforit.com.org" to remain in the address bar after the user was redirected to the "com.org" website.  But a reasonable jury could not find that the display of "goforit.com.org" is a literally false

---

[15]GEL must prove:

> (1) A false or misleading statement of fact about a product;
> (2) Such statement either deceived or had the capacity to deceive a substantial segment of potential consumers;
> (3) The deception was material, in that it is likely to influence the consumer's purchasing decision;
> (4) The product is in interstate commerce; and
> (5) The plaintiff has been or is likely to be injured as a result of the statement at issue.

*IQ Prods. Co. v. Pennzoil Prods. Co.*, 305 F.3d 368, 375 (5th Cir. 2002) (citing *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 495 (5th Cir. 2000)).

statement.  It is a web address, one that leads to "com.org."  The web address "goforit.com.org" is a literally true description of one address that is associated with the website "com.org."  Because defendants have at most made a misleading but not literally false statement by displaying "goforit.com.org" in the address bar, GEL must present evidence of actual deception.  *See Pizza Hut*, 227 F.3d at 497 (holding that, where statements are ambiguous or true but misleading, plaintiff must present evidence of actual deception).

GEL cites Grant's testimony that he recalled reading some posts on message boards where users expressed confusion about arriving at websites such as "com.org."  Even if a reasonable jury could find from this evidence that defendants used Wildcard DNS and manipulated the address bar display to confuse users about how they arrived at defendants' websites, GEL would still be obligated to prove the essential elements of materiality and injury.  GEL has failed to present any evidence that the redirected consumers would have found the display of "goforit" in the web address material in deciding whether to click on the advertisements on "com.org."  Nor has GEL adduced evidence that would enable a reasonable jury to find that any of the affected users was even aware of "GoForIt.com" as a competing entity.  For example, GEL has not presented evidence of consumer surveys or of consumers' direct reactions to seeing "goforit" in the address bar.  Because GEL has no evidence that would enable a reasonable jury to find that GEL has satisfied the

essential element of materiality, GEL cannot prove a likelihood of being "injured as a result of the statement at issue." And because a reasonable jury could only find that "go for it" is a common expression in conversational English, and because myriad other websites unaffiliated with GEL incorporate "goforit" into their web addresses, a reasonable jury could not find that any of the users from the log files who typed "goforit" intended to go to GEL's website.

### D

Therefore, GEL cannot prevail on its § 1125(a)(1) claim. GEL has not presented evidence that would enable a reasonable jury to find "likelihood of confusion," as required to prevail under § 1125(a)(1)(A), and it has not introduced evidence that defendants' allegedly misleading statements caused material deception and actual injury, as is required to prove a claim under § 1125(a)(1)(B).

### VI

GEL also alleges that defendants are liable for common law trademark infringement, in violation of Texas common law.

### A

Defendants move for summary judgment, contending that GEL must meet the same elements that are required to prove its federal trademark infringement claim, and that because it cannot meet those elements, its common law claim fails as well. In particular,

defendants posit that GEL cannot prove that defendants used GEL's mark or any mark that is confusingly similar to GEL's mark.

GEL responds that the same arguments they raised in the federal trademark infringement claim also apply here. It insists that defendants are not entitled to judgment as a matter of law because there is a genuine issue of material fact whether defendants have "used" the GOFORIT mark in conjunction with their registered domain names for commercial purposes.

B

"The issues in a common law trademark infringement action under Texas law are no different than those under federal trademark law." *All Am. Builders, Inc. v. All Am. Siding of Dallas, Inc.*, 991 S.W.2d 484, 488 (Tex. App. 1999, no pet.); *KLN Steel Prods. Co. v. CNA Ins. Cos.*, 278 S.W.3d 429, 440 (Tex. App. 2008, pet. denied); *Sport Supply Group, Inc. v. Columbia Cas. Co.*, 335 F.3d 453, 461 (5th Cir. 2003). Specifically, Texas common law requires "a likelihood of confusion between [plaintiff's] mark and that of [plaintiff's] competitor." *All Am. Builders*, 991 S.W.2d at 488; *see also Horseshoe Bay Resort Sales Co. v. Lake Lyndon B. Johnson Improvement Corp.*, 53 S.W.3d 799, 809 (Tex. App. 2001, pet. denied) (using same factors as federal trademark cases to analyze likelihood of confusion). Because, for the reasons explained above, GEL has failed to produce evidence that would enable a reasonable jury to find a likelihood of confusion between GEL's

GOFORIT mark and "goforit.com.org," GEL's common law trademark infringement claim fails.   Defendants are entitled to summary judgment dismissing this claim.

VII

GEL's final claim is for common law unfair competition.

A

Defendants move for summary judgment, contending, *inter alia*, that GEL must provide an independent substantive tort to succeed on this claim.   GEL responds that its cyberpiracy, federal service mark infringement, false designation of origin, false description, false representation, and common law trademark infringement claims are tenable, and that these alleged violations form the basis of their unfair competition claim.

B

To prevail on a claim of unfair competition under Texas law, GEL must show "some finding of an independent substantive tort or illegal conduct" by defendants that interfered with GEL's ability to conduct its business.   *See RTLC AG Prods. v. Treatment Equip. Co.*, 195 S.W.3d 824, 833 (Tex. App. 2006, no pet.); *Taylor Publ'g Co. v. Jostens, Inc.*, 216 F.3d 465, 486 (5th Cir. 2000).   Because GEL is not entitled to recover on any of its claims against defendants and has not produced evidence that would enable a reasonable jury to find that defendants committed an independent substantive tort or illegal conduct, defendants are entitled to

summary judgment dismissing this claim.

VIII

The court now considers GEL's motion for partial summary judgment addressed to defendants' counterclaims for reverse domain name hijacking, under 15 U.S.C. § 1114(2)(D)(iv), and tortious interference with contract, under Texas common law.

A

GEL moves for summary judgment dismissing defendants' counterclaim for reverse domain name hijacking, contending that defendants have no evidence that GEL made a material misrepresentation or that defendants' domain name was transferred, and that defendants cannot prove that they have been damaged. Defendants respond that GEL knowingly misrepresented to Tucows that defendants' domain names were identical or confusingly similar to GEL's GOFORIT mark. Defendants assert that they incurred damages as a result, pointing to the legal fees, additional domain hosting expenses, and loss of ability to sell domain names.

B

To prevail on a reverse domain name hijacking claim under 15 U.S.C. § 1114(2)(D)(iv), the claimant must show that a registrar took "action" based on a "knowing and material misrepresentation" by another that a "domain name" is "identical to, confusingly similar to, or dilutive of a mark." *Id.* The statute defines "action" as "any action of refusing to register, removing from

- 42 -

registration, transferring, temporarily disabling, or permanently canceling a domain name" in the "implementation of a reasonable policy" by the registrar "prohibiting the registration of a domain name that is identical to, confusingly similar to, or dilutive of another's mark." *Id.* § 1114(2)(D)(ii)(II).

A reasonable jury could find that defendants did not register a domain name that resembled GEL's mark. As noted above, "domain name," as defined in 15 U.S.C. § 1127, means "any alphanumeric designation which is registered with or assigned by any domain name registrar, domain name registry, or other domain name registration authority as part of an electronic address on the Internet." Although defendants' second level domain names are registered, the third level domains in question are generated by Wildcard DNS on defendants' websites——that is, they are not "registered with or assigned by any domain name registrar." None of defendants' domain names incorporates plaintiff's GOFORIT mark into the name, nor are any of defendants' "domain names," as that term is defined by statute, confusingly similar to GOFORIT. Addresses such as "com.org," by themselves, are not confusingly similar to GEL's marks; the potential confusion that GEL alleges is possible only when sites that resemble top level domains, such as "com.org," are combined with Wildcard DNS and defendants' automated functions to display third level domains such as "goforit.com.org." *Compare Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036,

1055 (9th Cir. 1999) (noting that the addition of a ".com" suffix, by itself, did not distinguish the domain name from the mark) *and Prime Publishers, Inc. v. Am.-Republican, Inc.*, 160 F.Supp.2d 266, 280 (D. Conn. 2001) (concluding that addition of generic or geographic term, without more, did not sufficiently distinguish domain name from protected mark) *with 1-800 Contacts*, 414 F.3d at 408-09 (concluding that addition of "www." and ".com" transformed trademark into public key).  The instant case is distinguishable from cases like *Brookfield* and *Prime Publishers*, however, because both of those cases involved confusingly similar *second level* domains.  Given the limited definition of "domain name" contained in § 1127, a reasonable jury could find that GEL knowingly misrepresented the extent of its rights under the ACPA by sending Tucows a copy of the ACPA allegations in GEL's complaint in this lawsuit.

Even assuming that domain names such as "com.org" can be confusingly similar to GEL's mark because of Wildcard DNS——i.e., because a user could conceivably type "goforit" into the address bar with specific reference to GEL's mark but end up at "goforit.com.org," confusing it with the "GoForIt.com" website——GEL would still not be entitled to summary judgment.  GEL did not limit its registration lock request to those websites where its ACPA claim was arguably the strongest (e.g., domain names that resemble top level domains).  It asked Tucows for a registration lock on

"Accused Domain Names"——that is, *all* of the domain names set forth in the exhibits of its complaint.[16]  As a result, about 295 domain names belonging to defendants were allegedly frozen, regardless whether a user had ever typed "goforit" in conjunction with any particular website to prompt an automated display of "goforit.[defendant-owned domain name].com" in the address bar.

Among the blocked sites were generically named sites such as "snowmobile.com," which, even under an expansive interpretation of *Brookfield* could not be construed as "identical" or "confusingly similar" to GEL's marks under the statutory definition of "domain name."  *See Elvis Presley Enters.*, 141 F.3d at 202 (citing *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 936 (4th Cir. 1995); *Oreck Corp. v. U.S. Floor Sys., Inc.*, 803 F.2d 166, 171 (5th Cir. 1986)) (explaining that courts, in evaluating likelihood of confusion, have given greater weight to the dominant, "attention-getting," or "salient portions" of the mark).  Whatever the weaknesses of GEL's case against defendants' use of domain names that resemble TLDs, the case is even weaker for websites such as "snowmobile.com," where a user's attention is split between "goforit" in the third level domain and whatever the substantive

---

[16]In all, there were 290 domain names affiliated with DigiMedia that were listed in Exhibit A, and five domain names affiliated with Happy Days that were listed in Exhibit B.

name of the second level domain may be.[17]

For these generic websites, GEL's trademark and ACPA claims rest on the tenuous predicate that a third party thinking of GEL's services might input "goforit.[generic domain name].[top level domain name]" into the address bar, and that defendants' Wildcard DNS might direct the user to a non-GEL website without changing the address bar display.  The summary judgment record would not permit the finding that GEL owns a trademark in generic domain names such as "dress.com" or "snowmobile.com," and defendants' generic sites do not preclude GEL from registering its own trademark as a domain name.  The mere fact that a non-infringing second level domain name owner enables Wildcard DNS and displays what the third-party user actually entered into the address bar does not convert the domain name into GEL's protected property.  Accepting GEL's interpretation of the ACPA would make any Wildcard DNS-enabled site that displays the user's input, verbatim, in the address bar subject to registration lock, not only at GEL's request but at the request of any trademark owner concerned that a third party might intentionally or accidentally input some combination of its mark and another's domain name into an address bar.  Here, a reasonable jury could find that GEL effectively sought to shut down websites that had no relation to GEL's mark, except for the hypothetical

---

[17]For example, in "goforit.snowmobile.com," "snowmobile" is a more dominant, attention-getting feature of the URL than "com" would be in "goforit.com.org."

possibility that a third party might type some combination of "goforit" and a defendant-owned domain name.

In sum, a reasonable jury could find that defendants do not own any "domain name," as that term is defined in § 1127, that is identical or confusingly similar to GEL's mark.  It could also find that GEL sent Tucows a letter accusing defendants of "unlawful use" of "domain names," in violation of the ACPA, and enclosed a copy of the complaint in this lawsuit specifically accusing defendants' domain names of being "confusingly similar" to GEL's GOFORIT mark. It did this even though a plain reading of the ACPA would preclude this argument, which is premised on GEL's user-generated *third level* domains.  The language of the ACPA, together with GEL's attempts to shut down defendants' sites *en masse*, without differentiating between websites that had actually redirected users who had typed "goforit" and those who had not, would enable a reasonable jury to find that GEL made a "knowing and material misrepresentation" to Tucows in alleging that all of defendants' domain names were in violation of the ACPA when, in fact, none of them was.  Tucows, as registrar for the domain names, maintains a discretionary policy of suspending a registrant's ability to use domain names or modify registration records, once it is notified that a complaint has been filed against the registrant.  Under this policy, and in response to GEL's letter, Tucows temporarily disabled most or all of defendants' websites.  Temporary

disablement constitutes an "action," as that term is defined in § 1114(2)(D)(ii)(II). Therefore, a reasonable jury could find that GEL's letter directly caused Tucows to disable defendants' websites, taking sufficient adverse action for GEL to be held liable for reverse domain name hijacking.

Defendants have introduced evidence that would enable a reasonable jury to find in their favor on their counterclaim under § 1114(2)(D)(iv) for reverse domain name hijacking.[18] GEL's motion is denied as to this counterclaim.

IX

Finally, the court considers defendants' counterclaim for tortious interference with contract under Texas common law.

A

GEL moves for summary judgment dismissing this claim on the ground that defendants have not produced evidence in support of each of the essential elements of this cause of action. Specifically, they posit that defendants have not adduced evidence of a contract between themselves and a third party; that, even if

---

[18]GEL argues that proof of damages is an element of reverse domain name hijacking. This is contrary to the statutory language. Section 1114(2)(D)(iv) provides that if a registrar takes an action based on a knowing and material misrepresentation that a domain name is confusingly similar to a mark, then the person who made the misrepresentation "shall be liable for any damages, including costs and attorney's fees, incurred by domain name registrant as a result of such action." In any case, a reasonable jury could find that defendants have incurred damages in the form of recoverable costs and attorney's fees.

there were such a contract, they have not shown that GEL willfully and intentionally interfered with it; and, that they cannot show that they have been damaged or have suffered a loss as a result of GEL's alleged actions.

Defendants respond by identifying the contract at issue as the "Tucows Master Services Agreement" and point out that GEL was aware of the agreement, having explicitly referenced it in its letter to Tucows.  Defendants allege that the letter was sent for the purpose of causing lockdown of defendants' domain names and that defendants were damaged as a result of the ensuing lockdown.

B

GEL maintains that defendants have not adduced evidence of a contract between themselves and a third party.  Under Texas law, an action for tortious interference of contract requires, *inter alia*, proof of "the existence of a contract subject to interference." *Tex. Beef Cattle Co. v. Green*, 921 S.W.2d 203, 210 (Tex. 1996).

A reasonable jury could find that there was a contract between Tucows and the relevant defendants (DigiMedia, CyberFusion, and HappyDays)[19] and that GEL interfered with this contract.  In their response to GEL's motion for summary judgment, defendants clarify

---

[19]Defendants submitted a form copy of the Tucows Master Services Agreement that does not identify the registrant party. Day's declaration clarifies that DigiMedia, CyberFusion, and HappyDays entered into the agreement as registrants.  Day does not purport to be a party to the agreement in his personal capacity. For the remainder of this section, "defendants" refers to the defendants who were parties to the agreement with Tucows.

that the contract on which they base their tortious interference counterclaim is the "Tucows Master Services Agreement" ("Tucows Agreement").  They include a copy of the Tucows Agreement in the appendix to their response.   GEL acknowledges that defendants entered into the Tucows Agreement.   Defendants have therefore produced sufficient evidence to enable a reasonable jury to find that they had a contract with a third party that is subject to interference.

C

GEL contends that this counterclaim must be dismissed because defendants have not shown that GEL interfered with their contract with Tucows.

1

The court holds that a reasonable jury could find that GEL interfered with the contract between Tucows and defendants.  It is undisputed that GEL sent Tucows a letter requesting a registration lock on defendants' domain names.  It is also uncontested that GEL intended that the letter result in the suspension of defendants' services and that, shortly after GEL made the request, Tucows complied.  A reasonable jury could thus find that GEL interfered with the performance of services outlined in defendants' contract with Tucows.  *See Tippett v. Hart*, 497 S.W.2d 606, 611 (Tex. App. 1973, writ ref'd n.r.e.) (holding that interfering with performance of contract is actionable interference of contract, regardless

whether actual breach is induced); *State Nat'l Bank v. Farah Mfg. Co.*, 678 S.W.2d 661, 689 (Tex. App. 1984, writ dism'd by agr.).

2

GEL also argues that it did not interfere with the Tucows Agreement because, in influencing Tucows to suspend services, it merely induced Tucows to do what Tucows had a right to do under the contract terms. GEL also posits that, by entering into the Tucows Agreement, defendants "waived" their right to dispute any claim arising out of a Tucows' registration lock.

"Ordinarily, merely inducing a contract obligor to do what it has a right to do is not actionable interference." *See ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997). Tucows had a contractual right to suspend services.[20] It is not sufficient, however, for GEL simply to allege that Tucows was exercising its discretion. *ACS Investors* and its progeny are distinguishable from this case in that those decisions involved situations where the defendants were acting within their rights to compete or within a contractually-defined right. In *ACS Investors*

---

[20]The Tucows Agreement provides, in pertinent part:

> If Tucows is notified that a complaint has been filed with a judicial or administrative body regarding [customer's] domain name, Tucows may, at its sole discretion, suspend [the customer's] ability to use [its] domain name or to make modifications to [its] registration records[.]

Ds. June 2, 2010 App. 240.

the court rejected the plaintiff's allegations that a competitor "interfered" with the plaintiff's purchase option by negotiating a purchase of its own, because the contract expressly permitted the seller to sell to an outside buyer. *See ACS Investors*, 943 S.W.2d at 430. The other cases cited in *ACS Investors* also relate to a competitor's attempt to induce a breach so that the obligor would instead negotiate with the competitor, where the contract explicitly recognized the obligor's right to negotiate with third-party competitors. *See, e.g., C.E. Servs., Inc. v. Control Data Corp.*, 759 F.2d 1241, 1248 (5th Cir. 1985); *Kingsbery v. Phillips Petrol. Co.*, 315 S.W.2d 561, 576 (Tex. Civ. App. 1958, writ ref'd n.r.e.) (holding that business competitor's attempt to outbargain and persuade obligor to cancel contract was "entirely legitimate"); *W. Tex. Gas v. 297 Gas Co.*, 864 S.W.2d 681, 686 (Tex. App. 1993, no pet.) (concluding that competitor had interfered with purchase contract by inducing purchaser's breach, but holding that interference was privileged because contract contemplated that purchaser would be free to negotiate with other suppliers).[21]

---

[21]And even those cases noted that there is a limit to what competitors can do in the name of competition. *See, e.g., C.E. Servs.*, 759 F.2d at 1249 ("Only 'fair' competition will do, for 'if there is sharp dealing or overreaching or other conduct below the behavior of fair men similarly situated, the ensuing loss should be redressed.'" (quoting *Leonard Duckworth, Inc. v. Michael L. Field & Co.*, 516 F.2d 952, 958 (5th Cir. 1975))); *W. Tex. Gas*, 864 S.W.2d at 686 (stating that interference is privileged if it results from the "bona fide exercise" of a party's own rights); *cf. Kingsbery*, 315 S.W.2d at 576 (noting that it is legitimate for business competitor to try to persuade obligor "by lawful means" to breach).

The cases that follow *ACS Investors* generally involve situations where the claimed tortious interference was within the *defendant's* own contractual rights. *See Baty v. Protech Ins. Agency*, 63 S.W.3d 841, 857 (Tex. App. 2001, pet. denied) (holding that *defendant* insurance companies acted within their own contractual rights in honoring changes in agency appointments by the insureds, as the contracts required them to do); *Bank One, N.A. v. Stewart*, 967 S.W.2d 419, 448 (Tex. App. 1998, pet. denied) (noting that defendant had authorization to sell plaintiff's note to other defendant); *cf. Newman v. Kock*, 274 S.W.3d 697, 703 (Tex. App. 2008, no pet.) (citing *Holloway v. Skinner*, 898 S.W.2d 793, 796 (Tex. 1995)) (noting rule that "a party cannot tortiously interfere with its own contract").

A reasonable jury could find that GEL was not acting to serve "a legitimate purpose of [its] own" as a third party competitor. *Cf. Spectrum Creations, L.P. v. Carolyn Kinder Int'l, LLC*, 2008 WL 416264, at *79 (W.D. Tex. 2008) (describing situation where third-party competitor legitimately pressured obligor to breach, so that obligor could work with competitor instead). GEL is not in the position of a bona fide competitor seeking Tucows' services, who induces an efficient breach from Tucows by outbidding others in "fair competition." *Cf. C.E. Servs.*, 759 F.2d at 1249 (concluding that overreaching conduct falling below "the behavior of fair men similarly situated" may constitute tortious interference). "A

party is privileged to interfere with the contractual relations of another if: (1) it acts in the bona fide exercise of its own rights, or (2) the interfering party has an equal or superior right in the subject matter to that of the party to the contract." *Baty*, 63 S.W.3d. at 857.   The present case is therefore distinguishable from those cited in *ACS Investors*, where competitors induced breaches while pursuing their own lawful rights to submit competing bids to mutual customers.   Such parties, as competitors, had an "equal right" to compete for the contract obligor's services.   GEL, by contrast, had no equal or superior right to interfere with Tucows' services because GEL was not competing with defendants for those services, and the fact that Tucows provided services to defendants would not have excluded Tucows from providing the same services to GEL.

3

GEL also contends that it cannot be held liable for tortious interference because defendants "waived" their right to dispute Tucows' registration lock when they entered into the Tucows Agreement.   GEL has pointed to no contractual provision that waives defendants' rights to sue third parties.   Even if the Tucows Agreement were to bar defendants from suing Tucows,[22] the agreement does not address defendants' right to sue GEL, a non-party to the

---

[22]The Tucows Agreement provides: "You agree that in the event a domain name dispute arises with any third party, you will indemnify and hold us harmless[.]"   Ds. June 2, 2010 App. 240.

contract.

Absent an explicit waiver provision, GEL asserts that, where a domain name registrant agrees to submit to a domain name dispute resolution procedure, the registrant is precluded from bringing tort claims based on the implementation of that procedure. *See Eurotech, Inc. v. Cosmos European Travels Aktiengesellschaft*, 189 F.Supp.2d 385, 394 (E.D. Va. 2002) ("An agreement to participate in a proceeding cannot render initiation of that proceeding a tort claim."). GEL relies on § 14.3 of the Tucows Agreement to establish that defendants agreed to be subject to GEL's actions.

Section 14.3 permits Tucows to "suspend Customer's or Customer's Users' access to any or all of the services described in this Agreement," however, if Tucows determines "in its reasonable discretion" that the customer has breached provisions in the contract. Ds. June 2, 2010 App. 227-28. Section 14.3 applies only after Tucows decides that a breach has occurred, and GEL has not established without genuine dispute that Tucows implemented the registration lock after determining that defendants had breached the agreement.[23] And even if defendants agreed to submit to Tucows'

---

[23]Rather, it is more likely that Tucows had been acting on the basis of Appendix B, ¶ 8 of the Tucows Agreement, the provision which GEL's counsel actually cited as the basis for its registration lock letter. It provides: "If Tucows is notified that a complaint has been filed with a judicial or administrative body regarding your domain name, Tucows may, at its sole discretion, suspend your ability to use your domain name or to make modifications to your records[.]" Ds. June 2, 2010 App. 240. The language of ¶ 8 suggests that Tucows suspended defendants' accounts

procedures for account suspension, GEL has not established that they agreed to a dispute registration procedure with a third party like GEL. *Eurotech* is therefore distinguishable, because in that case the plaintiffs sued the defendant for initiating arbitration after having agreed to submit their dispute to arbitration. Section 14.3 of the Tucows Agreement requires defendants to consent to Tucows' account-suspension powers; it does not prescribe how to handle third-party disputes.

D

Under Texas law, a party suing for tortious interference with contract must also prove "a willful and intentional act of interference." *Tex. Beef Cattle*, 921 S.W.2d at 210. GEL maintains on two grounds that defendants cannot satisfy this element: first, it contends that it lacked evidence of the existence of a contract before defendants submitted their appendix in support of their summary judgment response; and, second, it argues that it was acting in good faith in the exercise of a colorable legal right.

1

For GEL's actions to be "willful and intentional," GEL must have had knowledge of facts and circumstances that would lead a reasonable person to believe that a contract existed. *See Steinmetz & Assoc., Inc. v. Crow*, 700 S.W.2d 276, 277-78 (Tex. App.

─────────────

as a direct response to GEL's letter, rather than because of a contractual breach.

─ 56 ─

1985, writ ref'd n.r.e.).  Although defendants did not introduce the Tucows Agreement until they filed their opposition appendix, a reasonable jury could find that GEL was aware of the agreement at the time it allegedly interfered with it.  GEL cited the Tucows Agreement in the letter to Tucows requesting the registration lock, and the letter's citation of URLs would permit a reasonable jury to find that the agreement was accessible to GEL and its counsel online.  GEL cited to the contractual terms to urge Tucows to suspend defendants' domain names, which would permit the reasonable finding that GEL believed the contract validly governed the relationship between Tucows and defendants.  The letter's explicit acknowledgment of and reliance on the contract would permit the reasonable finding that GEL was aware of the contract and knew enough about the contract and the nature of Tucows' relationship with defendants to believe reasonably that a contract existed.

2

GEL also argues that it merely engaged in "reasonable behavior" to protect its lawfully registered mark, and that this behavior cannot be considered "willful" or "intentional" interference.  In support, GEL cites *Prudential Insurance Co. v. Financial Review Services, Inc.*, 29 S.W.3d 74, 80 (Tex. 2000).  There the court held that "the justification defense can be based on the exercise of either (1) one's own legal rights or (2) a good-faith claim to a colorable legal right, even though that claim

ultimately proves to be mistaken." *Id.*

A legal justification or excuse for interference is properly viewed as an affirmative defense rather than an element of defendants' counterclaim. *See Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989) (holding that legal justification and excuse is essentially an assertion of "privilege," and, as such, the one who asserts the privilege has the burden of proof). The district court must determine as a matter of law whether the counterdefendant had a legal right to interfere with the contract. If there was no legal right, then the court must determine whether there was a colorable right, and the jury must determine whether the colorable right was exercised in good faith. *See Prudential Ins.*, 767 S.W.2d at 80.

A trademark owner has the right to protect its mark, but the law imposes consequences when an owner overreaches and affects others' rights. *See, e.g.*, 15 U.S.C. § 1114(2)(D)(iv) (permitting recovery of damages where trademark owner makes knowing and material misrepresentation of how far its rights extend over another's domain name). As already discussed above, GEL's ACPA claims were without basis. Assuming at this stage that GEL had a colorable right, the jury must determine whether the colorable right was exercised in good faith. Here, the summary judgment record would permit it to find that it was not. The jury could reasonably find that GEL acted in bad faith: rather than limit its

suspension request to any particular domain names as to which it had evidence of infringement or a basis to allege consumer confusion, GEL made a blanket request that all of defendants' domain names with Tucows be locked. This included domain names such as "snowmobile.com" that have no particular relation to GEL's services and no similarity to GEL's mark, where the request was based on the purely hypothetical fear that a third party might decide to type something like "goforit.snowmobile.com" and end up at a defendant-owned site. A reasonable jury could find that GEL did not believe that its trademark rights extended this far and that the request to suspend the entirety of Tucows' services was made in bad faith. Such a finding would eliminate the "legal justification or excuse" affirmative defense, and the jury could reasonably find that GEL's interference was "willful" and "intentional."

3

The court also concludes that GEL cannot defeat defendant's counterclaim at the summary judgment stage based on the *Noerr-Pennington* doctrine.

The *Noerr-Pennington* doctrine immunizes actions to petition any branch of government, including petitions to the courts for redress. *See Calif. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972). The right to petition the courts also immunizes "acts reasonably and normally attendant upon effective

litigation." *Coastal States Mktg., Inc. v. Hunt*, 694 F.2d 1358, 1367 (5th Cir. 1983).

In Texas, the *Noerr-Pennington* doctrine applies outside the antitrust context, *see RRR Farms, Ltd. v. American Horse Protection Ass'n*, 957 S.W.2d 121, 129-30 (Tex. App. 1997, pet. denied). *Noerr-Pennington* immunity can apply to trademark owners' attempts to protect their intellectual property rights. *See, e.g., March Madness Athletic Ass'n v. Netfire, Inc.*, 2002 WL 32168078, at *1 (N.D. Tex. 2002) (Buchmeyer, J.) (deciding, without discussion, that trademark owners' cease-and-desist letters and invocation of registrar's domain name dispute resolution procedure were immunized under *Noerr-Pennington*). The doctrine is recognized as an affirmative defense. *Id.* at 129 ("The Association's claim of immunity based on the *Noerr-Pennington* doctrine is an affirmative defense." (citing *N.C. Elec. Membership Corp. v. Carolina Power & Light Co.*, 666 F.2d 50, 52 (4th Cir. 1981))). Because GEL will have the burden of proof at trial on this affirmative defense, to obtain summary judgment, it must meet the heavy burden of establishing beyond peradventure all of the essential elements of the defense. This means that GEL must demonstrate that there are no genuine and material fact disputes and that it is entitled to summary judgment as a matter of law. Because it has not met this burden, it is not entitled to summary judgment on this basis. At a minimum, *Noerr-Pennington* immunity does not extend to conduct

that is in fact "'a mere sham to cover what is nothing more than an attempt to interfere directly with business relationships of a competitor.'" *Coastal States Mktg.*, 694 F.2d at 1368 (quoting *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961)). GEL has not demonstrated as a matter of law that the sham exception cannot apply in this case.

E

GEL also argues that defendants cannot prove damages because a contract was not breached. This argument is misplaced, because a party can be liable for tortious interference, even without a breach, if it makes performance of a contract "more burdensome, difficult or impossible, or of less or no value to the one entitled to performance." *Tippett*, 497 S.W.2d at 610. A reasonable jury could find that GEL's letter prompted Tucows to suspend its services to defendants. Even if Tucows acted within the terms of the contract in locking the domain names, it caused the performance of the contract to be "of less or no value" to defendants. A reasonable jury could find that defendants incurred legal costs in convincing Tucows to unlock its domain names and incurred higher domain hosting expenses because they could not switch to a cheaper hosting company during the registration lock.

A reasonable jury could also find that GEL's letter proximately caused these damages. Proximate cause is a question for the trier of fact. *Richardson-Eagle, Inc. v. William M.*

*Mercer, Inc.*, 213 S.W.3d 469, 474 (Tex App. 2006, pet. denied). "Establishing causation requires that the plaintiff bring forth sufficient facts so that the evidence, and logical inferences drawn from the evidence, support a reasonable probability that the defendant's acts or omissions were a substantial factor in bringing about injury." *Id*. GEL filed a complaint and wrote a letter informing Tucows of the pending litigation alleging ACPA violations and trademark infringement, even though the statutory language of the ACPA did not cover defendants' actions and there was no case law to suggest that trademark infringement could extend to third level domains or Wildcard DNS. They cited to the specific provision in the Tucows Agreement that permitted Tucows to suspend an account upon notification of a legal complaint. Within one week, Tucows performed the actions requested in the letter. A jury could reasonably find that, but for the letter, Tucows would not have suspended the accounts on its own. As a direct result of the suspension, defendants could no longer alienate their domain name interests or switch providers, and defendants incurred costs to convince Tucows to resume services. A reasonable jury could find that, in requesting the registration lock, GEL could have reasonably foreseen that such injuries would be the natural consequence of locking all domain names that constitute defendants' business. As such, there is sufficient evidence of proximate cause and injury for a jury to find that these elements have been met.

GEL's motion for summary judgment is denied as to defendants' tortious interference counterclaim.

                    *       *       *

For the reasons set out, the court grants defendants' January 25, 2010 motion for partial summary judgment and denies GEL's May 3, 2010 motion for partial summary judgment.  Because this memorandum opinion and order disposes of all of GEL's claims, GEL's February 5, 2010 appeal of the magistrate judge's order and GEL's April 30, 2010 motion for adverse inference are denied as moot.[24]

**SO ORDERED.**

October 25, 2010.

_____
SIDNEY A. FITZWATER
CHIEF JUDGE

_____

[24]The adverse inference motion fails because the server log files from Reflex Publishing—a nonparty who also uses Wildcard DNS—cannot be used to bolster an inadequate case against defendants.  Even if the destroyed server log files from Reflex Publishing contained everything GEL had anticipated—i.e., evidence of users typing "goforit" into the address bar and being redirected via Wildcard DNS to Reflex Publishing's sites—it would not change the outcome of the case.